MERRITT & CHAPMAN DERRICK & WRECKING CO. v. GREENE et al.

(Circuit Court, D. Connecticut. July 26, 1906.)

No. 527.

**1. SHIPPING—CONTRACT—SERVICES OF WRECKING STEAMER—CONSTRUCTION.**
Where plaintiff contracted on behalf of a wrecking company to pull a schooner lodged in the launching with a powerful steamer to M.'s satisfaction, the contract required that the pulling should be of such a character as should satisfy a reasonably prudent man in the light of the circumstances surrounding the transaction.

2. SAME.

Where, after a wrecking company had pulled a stranded schooner sufficiently to comply with a contract to pull the same to M.'s satisfaction, the schooner was not floated, and the services of the company's steamer were necessary in the subsequent endeavors which finally dislodged the schooner, the wrecking company was entitled to recover for such subsequent services on a quantum meruit.

At Law.

See 129 Fed. 969.

James D. Dewell, Jr., for plaintiff.

Canfield & Judson, for defendants.

PLATT, District Judge. This is an action at law demanding $500 on an express contract, and $2,165 for extra work beyond the contract on quantum meruit. The answer admits the contractual obligation, but denies all liability on quantum meruit. By stipulation it has been tried to the court without a jury, and the court therefore, from the testimony given, reaches the following:

## Conclusions of Fact.

On Monday, July 23, 1902, Greene Bros. tried to launch, at their Bridgeport yard, a large four-masted schooner, named the Perry Setzer. She was about 216 feet long, 42 feet beam, 17.8 feet depth of hold, 1,392 gross tonnage, and valued at from $65,000 to $70,000. She stuck on the ways, as she was sliding off, at a point about 35 feet from her bow, in such a manner the she was liable to become "hogged" or "strained," and thereby seriously injured, if she remained long in that position.

Frank Miller of Bridgeport was largely interested in the schooner, as a creditor for materials furnished in her construction, and as bondsman for Greene Bros. in this enterprise. He was present at the festivities which had been prepared in connection with the launching. Several wrecking companies were at once notified by telephone of the situation, and a representative of the plaintiff company was the first to respond. He was Thomas Shelvin, familiarly known as "Capt. Tom." He arrived in the afternoon of the same day, and, after examining the state of the schooner with one of the brothers, he met both brothers and Frank Miller at the office of the firm. Miller was requested by the firm to take charge of the matter and agreed to do so, thereby becoming jointly responsible for the wrecking work. Miller asked Capt. Tom how much of an accident it was. Capt. Tom made light of it and expressed his belief that it would be an easy matter to pull the schooner off. He explained that his company had a powerful steamer called the "William E. Chapman"; that she would cost them $15 an hour; that in his opinion, the schooner would come off easily on the first pull; that it might take 10 hours to do it; that the apparatus to be used in connection with the steamer would be worth $200; making a total of $350, which in his judgment would free the schooner. Miller in response told Capt. Tom that it was an important matter; that they were all worried about the situation; that a failure in the launching would be a serious blow to the firm;

and to make a sure thing of it, he would propose that if the wrecking company would send up the steamer thoroughly equipped with appliances and men, and pull the schooner to his satisfaction, he would pay them $500. This proposition was accepted by Capt. Tom on behalf of the plaintiff.

The steamer and appliances came on Wednesday morning, July 23d, and operations began on the noontide. This attempt was a flat failure; the sand anchor which was placed so as to afford resistance and enable the steamer to pull effectively on the schooner giving away, and therefore being useless. Work on the nighttide of Wednesday was equally futile. On the noontide of Thursday the anchor, which on Wednesday had been placed in sand alone, was reinforced by a backing cable held by rocks on a nearby island. The cable used this time was not new, and parted at the first serious strain. On the nighttide of Thursday the schooner was moved a little, but the steamer was making jumping pulls, so-called, and very soon the cable again parted and work was suspended. Up to and including the pull on this tide, the schooner had been moved several feet, perhaps four or five. On the Friday noontide a pull was made which had a substantial effect, and the schooner almost came off. At the critical moment a hawser parted, and but for that accident, she would undoubtedly have gone free. This pull was one which, in my judgment, ought to have been considered satisfactory by a reasonable man of affairs. On the Friday nighttide a large quantity of oil barrels which had been procured by the defendants were put into use as a sort of improvised pontoon, and the schooner was started a little more. On the Saturday daytide more oil barrels were added by defendants and used in the same way. On this tide some little advance was made in pulling the schooner free. The Saturday nighttide work made no gain of importance. On the Sunday daytide the schooner came off with the Chapman's help.

Defendants, at various times, induced the small tugs about the harbor to lend a helping hand, and at last sent to New Haven for larger ones, but without the help of the Chapman the other tugs would not have been able to have made the necessary pull. During the latter part of the work two cables and anchors were necessarily used, with the knowledge of and without objection from the defendants. A diver was sent down on Friday to examine the hull and bottom. This was known by defendants and consented to. On Thursday the plaintiff became aware, through Capt. Tom, that there was a strong probability that pontoons would be needed, and on Friday, the suggestion having been acquiesced in by one of the Greene brothers, but without Miller's knowledge, it ordered them prepared, which was a work of some difficulty. They were gotten out and made ready during the usual working hours of that day. On Friday, between 3 and 4 o'clock in the afternoon, an order to prepare and send them came from the defendant firm, authorized by Miller. This order was canceled soon after 9 o'clock on Saturday morning. The pontoons could have been gotten out and ready during the hours between the definite order on Friday and the definite countermand on Saturday.

A fair price for the use of the steamer, men, and appliances, is

$150 per day. A fair price for getting the pontoons ready is $100. The use of the diver's services was worth $50. The use of the cables and anchors was worth $40 per diem.

From these facts the court draws the following:

### Conclusions of Law.

The contract was to pull the schooner to Miller's satisfaction for $500. In the eye of the law that should be interpreted as meaning that the pulling should be of such a character as to satisfy a reasonably prudent man in the light of the circumstances which surrounded this transaction. It was a valuable schooner in a dangerous plight; on the other hand, the wrecking steamer and appliances were expensive; the task undertaken was more difficult than anybody expected. When the schooner was finally dislodged the services of the Chapman were needed.

I have found as a fact that the close of the noontide pull on Friday completed such a pull as a reasonable man ought to expect, in view of the conceded fact that a clean pull off was not guarantied by the plaintiff. The defendants, it will be noticed, increased their supply of oil barrels after that pull and countermanded the order for pontoons early Saturday morning. This shows that they were satisfied after the Friday noon pull that deliverance was at hand. They could have sent the Chapman away, if they had wished to do so, but they knew that she was necessary. They knew what an expensive item she was, and it is not believable that the defendants would have gone to the expense which they did, if Mr. Miller had thought that as a reasonably prudent man he could keep on calling for pulls on each tide under the original contract. Plaintiff was fortunate in having taken the hint and prepared the pontoons before the absolute order reached it. If no order had come, the work would have been wasted. It came on Friday afternoon, and there was plenty of time before it was countermanded to have made the preparations. It would be inequitable to allow the plaintiff nothing for work done in compliance with the order, and the action on quantum meruit is one which particularly appeals to and should be governed by the conscience. The schooner came off on the Sunday daytide. That makes two days for which the plaintiffs have a right to charge under the quantum meruit.

| | |
|---|---:|
| Steamer 2 days | $300 |
| Cables and anchors 2 days | 80 |
| Services of diver | 50 |
| Getting pontoons ready | 100 |
| | $530 |
| Original contract | 500 |
| | $1,030 |

The other items in the bill of particulars are not warranted by the evidence.

Judgment may be entered for that amount.